van Gestel, Allan, J.
This matter is before the Court after a juiy-waived trial for findings of fact, rulings of law and an order for judgment.
FINDINGS OF FACT
Massachusetts Municipal Wholesale Electric Company (“MMWEC”), created by St. 1975, c. 775, is a public corporation and a political subdivision of the Commonwealth. MMWEC’s purpose is to plan, to acquire, and to establish independent electric power supply on behalf of municipal light departments and other electric utilities in Massachusetts. Acting as a wholesaler of electric energy, MMWEC either purchases energy in bulk from large generating facilities or participates in the ownership of all or part of electric generating facilities. MMWEC then sells the electricity to its members, to other facilities, and to municipal electric light departments within or without the Commonwealth.
MMWEC has its principal place of business in Ludlow, Massachusetts.
MASSPOWER is a joint venture organized as a Massachusetts general partnership with a place of business in Boston, Massachusetts and a gas-fired electricity generating unit in Springfield, Massachusetts. The individually named defendants are an aggregation of entities, some of whom formerly were involved in the operation and management of MASSPOWER, and some of whom currently are involved in the operation and management of MASSPOWER. Following a sale on December 28, 2005, the current owners of MASSPOWER became Silver Ship MP Partners, LLC and Silver Ship MP Partners II, LLC, affiliates of Flagship Energy and the investment firm Silverpoint Capital. For purposes of these findings and rulings, nothing turns on the identity of which entities were operating MASSPOWER at any of the material times involved in this litigation. The Court, therefore, simply will refer here throughout to MASSPOWER.
At the heart of this case is an agreement between MMWEC and MASSPOWER first executed on April 10, 1990, and later amended in parts not material to this case on April 30, 1991. The parties refer to this agreement as the “Power Purchase Agreement” or the “PPA.” At the time the PPA was executed, MASSPOWER'was planning to construct, own and operate a cogeneration facility (the “Facility”) having a designed net electrical capacity of approximately 239,000 kilowatts.
The Facility was to be, and did become, located at the site of the Monsanto Chemical Company in Springfield, Massachusetts. MASSPOWER’s cogeneration plant was intended to, and did, generate steam for sale to Monsanto and electricity to be sold through the New England Power Pool (“NEPOOL”).
*270 MMWEC agreed to purchase, through NEPOOL and pursuant to the NEPOOL Agreement, what ultimately was to become 7.86% of the net electrical capability and associated energy of the proposed Facility for a term of 20 years commencing on August 1, 1993. The PPA, absent early termination, is not due to expire until 2013.
Another component of the PPA is the “capacity charge,” designed to recover the capital costs of the MASSPOWER unit. A large portion of the capacity charge is fixed, so long as the unit is available to run, but regardless of whether it runs or not. The fuel costs are priced at costs which vary consistent with the energy generated at the Facility.
Pursuant to separate agreements that essentially pass through MASSPOWER’s charges under the PPA, along with MMWEC’s administrative expenses, MMWEC resells the electric capacity and energy purchased from MASSPOWER to municipal light departments serving the towns of Littleton, Wakefield, Groton, Ipswich and Ashbumham, and the City of Holyoke (the “municipals”).
MASSPOWER also signed long-term power purchase agreements with Boston Edison Company (“BECo”), Commonwealth Electric Company (“Com/Elec”), and Western Massachusetts Electric Company (“WMECo”) for all but 5% of the remaining output of the plant. BECo and Com/Elec later became part of NSTAR.
Under their agreements, these other utilities did not pay simply a pro rata share of MASSPOWER’s actual fuel costs, but rather paid for generated electricity based on pricing adjusted pursuant to formulae and indices as well as actual fuel costs.
The Second Amended Complaint seeks declaratory relief regarding MASSPOWER’s obligations under the PPA, money damages for alleged breaches thereof, specific performance of certain aspects thereof, and, of course, relief for alleged violations of G.L.c. 93A.
Under the PPA MASSPOWER was obliged to employ “prudent utility practice” in the operation of the Facility. The PPA defined “prudent utility practice” as “any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry in New England which, in the exercise of reasonable judgment in light of the facts known at the time a decision was made, could have been expected to accomplish the desired result in a manner consistent with regulations, reliability, safety, environmental protection, economy and expedition.”
A key requirement of the PPA, in Section 4.3, relates to dispatch of the Facility by the New England Power Exchange (“NEPEX”). This Section reads in full:
The Parties agree that the Facility will be available for dispatch by NEPEX in accordance with the NEPOOL Agreement and that the Facility will be deemed a dispatchable unit for purposes of economic dispatch by NEPEX, subject to provisions set forth in Appendix C. In the event that the Facility is dispatched at a capacity factor of less than sixty percent over a two-year period, [MASSPOWER] agrees to cooperate with [MMWEC] and the other Purchasers if they decide to seek to have the Facility declared “must-run” by NEPOOL.
Section 4.4 of the PPA requires MASSPOWER to “use due diligence to make available to [MMWEC], regularly and without interruption, [MMWEC’s] Entitlement.” “Entitlement” is defined in the PPA to “mean the percentage of the Net Capability and Corresponding Energy of the Facility that [MASSPOWER] has agreed to sell and a Purchaser has agreed to buy.” Here, MMWEC’s Entitlement is 7.86% of MASSPOWER’s Net Capability and Corresponding Energy of the Facility.
“Net Capability” is defined in the PPA as “the maximum, dependable load-carrying capability of the Facility, exclusive of capacity required for Facility use.” It is expressed in kilowatts and is “determined from time to time by tests conducted in accordance with the NEPOOL Agreement including NEPOOL Criteria, Rules and Standards and Operating Procedures.” There are different ratings for summer and winter. For example, the Facility, through periodic engineering audits, established a net capability that approximates 231.5 megawatts in the summer and 270.0 megawatts in the winter.
The primary fuel used by the Facility to generate electricity is natural gas. At the time the PPA was signed, MASSPOWER had not concluded any final gas purchase or transportation agreements. Instead, it provided MMWEC with “precedent agreements,” describing, for regulatory purposes, the anticipated contracts. After the PPA was signed, but before construction of the Facility, MASSPOWER supplied later iterations of its contemplated fuel supply and transportation agreements.
Also at the time of executing the PPA, MMWEC was aware that the pricing provisions in MASSPOWER’s long-term gas contracts would change pursuant to periodic “reopener” clauses intended to keep gas prices low enough to permit frequent dispatch of the plant. These clauses gave both MASSPOWER and the fuel companies the right to reopen and negotiate the contract pricing provisions at specified time intervals. Under the terms of the gas supply contracts, if the parties thereto could not reach agreement in the re-opener negotiations, either party could require arbitration.
There is a dispute between the parties relating to these fuel agreements and the rights of each party with regard to termination or modifications thereof. Consequently, the Court quotes from the material parts of Sections 2.4 and 2.5 of the PPA which speak to the fuel agreements.
*271 2.4 [MASSPOWER] intends to enter into an initial fuel supply and fuel transportation arrangement and a long-term fuel supply and fuel transportation arrangement of fuel to the Facility on terms and conditions which are acceptable to [MMWEC]. [MASSPOWER] agrees to submit the Fuel Supply and Fuel Transportation Contracts comprising its initial and long-term fuel supply and transportation arrangements ... to [MMWEC] for approval. The procedures for acceptance of the Fuel Agreements by [MMWEC] shall be as follows:
(a) Within ten (10) working days of [MASSPOWER’s] agreement upon the terms of a Fuel Agreement, [MASSPOWER] shall provide a copy of such terms to [MMWEC] for its review.
(b) [There follows a period of time within which MMWEC may indicate its objection].
(c) [MASSPOWER then has a period of time within which to attempt a cure.] If [MASSPOWER] is unable to cure or correct such matter(s) to which [MMWEC] objects by such date, [MASSPOWER] shall notify [MMWEC] and [MMWEC] may, at its option and by written notice tendered to [MASSPOWER] within thirty (30) days of [MMWEC’s] receipt of [MASSPOWER’s] notice, waive its objection; otherwise either party may terminate this Agreement as provided in Article 2.5 below.
2.5 Either Party may terminate this Agreement prior to the Commencement of Construction without further obligation to the other Party by tendering a written notice to the other Party (such notice to be effective upon receipt), if:
(1) [MMWEC] objects to any Fuel Agreement pursuant to Article 2.4 above, and [MASSPOWER] is unable to cure or correct the matters to which [MMWEC] objects and [MIMWEC] does not waive its objection in a timely manner as specified in Article 2.4;
(2) Despite [MMWEC’s] best efforts, [MMWEC] notifies [MASSPOWER] in writing that it is unable to enter into a transmission agreement on terms and conditions which are reflective of reasonable market conditions in New England;
In addition, [MMWEC] may terminate this Agreement prior to the Commercial Date in accordance with the milestone provisions set forth in Appendix B hereto.
“Commencement of Construction” is defined in the PPA as “the date on which [MASSPOWER] releases the turnkey construction contractor to commence construction of the Facility.”
The “Commercial Date” is defined in the PPA to “mean the first day of the first month following the date on which [MASSPOWER] notifies [MMWEC] in writing that the Facility is commercial...”
On August 12, 1991, MMWEC confirmed in writing to MASSPOWER that “[e]ach of the Fuel Contracts is acceptable to MMWEC and MMWEC waives any right it may have to terminate the Power Sale Agreement pursuant to Section 2.4 thereof.”
Consequently, with the approval of MMWEC, MASSPOWER entered into a contract with DistriGas of Massachusetts Corporation (the “DistriGas Contract”) for the purchase of vaporized liquefied natural gas (“LNG”) on a “firm” basis for a term of 20 years. The DistriGas Contract had a price structure which included fixed and variable components.
MASSPOWER also, with the approval of MMWEC, entered into a natural gas purchase contract with ProGas Limited and Orchard Gas Corporation (the “ProGas Contract”), which contained terms and conditions similar to, but not identical to, the DistriGas Contract, including a price structure based on fixed and variable components.
Also on August 12, 1991, MMWEC waived its right to substitute the WMECo or other utility power purchase agreements for its own. Section 9.4 of the PPA contained a “most favored nation” clause permitting MMWEC, prior to construction, to substitute in place of its own any other subsequent power purchase agreement made by MASSPOWER. Pursuant to that clause, MASSPOWER supplied MMWEC with the contract it had made with WMECo.
Among other things, the WMECo contract provided:
[MASSPOWER] shall not, without prior written consent of [WMECo], amend the reopener provision of its gas purchase contracts ... or change the price terms thereof other than in accordance with said reopener provisions, unless such change is reasonably likely not to have a material adverse effect on [WMECo] or its customers. [MASSPOWER] shall not, without the prior written consent of [WMECo] . . . enter into any contract or contracts which replace either or both of the long-term gas purchase contracts or any gas transportation contracts identified in Section 2.1 of Appendix A, unless the pricing and any price reopener terms of such replacement contract(s) are substantially the same as those of the contract being replaced or are reasonably likely not to have a material adverse effect on [WMECo] or its customers, taking into account the alternative sources of long term gas supplies and transportation arrangements available to the Facility at that time.
MMWEC knowingly chose not to substitute the WMECo contract for its own.
MMWEC and the municipals have at all relevant times been members of NEPOOL which governs the electric grid for New England.
In 1990, NEPOOL rules contemplated two general types of units for purposes of dispatch: “must run" and “dispatchable.”
*272 A “must run" unit was one that would run at all times other than when maintenance and system safety would require an outage, and thus operated even when not economically desirable to do so.
A “dispatchable” unit was directed to operate by the central system operator whose function included balancing electric generation with fluctuating electric demand, or load. The system operator selected units for generation based on “economic dispatch,” that is, turning on the units in order of their incremental cost of production as calculated in accordance with NEPOOL rules. Because the demand for electricity in New England changes hourly in accordance with consumer demand, NEPEX directed the dispatch of generating facilities each hour of each day in accordance with the NEPOOL Agreement.
Prior to 1999, the central system operator was known as NEPEX. In July of 1997, ISO New England, Inc. (“ISO-NE") succeeded NEPEX as the central system operator.
On and after May 1, 1999, ISO-NE’s selection of generators for dispatch has been determined by offers, or “bids,” submitted in a market system. These offers are given to ISO-NE either a day ahead or in real time, and include a price at which the unit will generate electricity.
Under the ISO-NE regime, generators are primarily selected for dispatch in order from lowest to highest bid until there is enough generation to meet demand in the particular hour; and the parties credited with their output are all paid the price offered by the last incremental megawatt of generation selected.
Generating units are frequently characterized by their operating profiles based on the frequency of dispatch: “peakers,” “baseload,” and “intermediate.”
Peaking resources have veiy low fixed costs and very high energy costs. They are cheap to build and expensive to operate. They are, therefore, only used for a relatively few hours each year to meet peak demands.
Baseload resources usually have high fixed costs and low energy costs. When the fixed costs are spread over many hours of operation, because of the low energy costs, the total cost per MWh of energy is relatively low.
Intermediate resources combine the characteristics of both baseload and peaking resources. They have moderate fixed and variable costs. They are the most economic way to supply the energy that occurs during weekday on-peak or business hours.
A unit’s frequency of dispatch is often expressed as “capacity factor,” that is, the ratio of the unit’s actual dispatch to its ability to generate, and thus reflects both the frequency and the level of dispatch.
MMWEC and the municipals understood at the time of executing the PPA that there would be occasions when the MASSPOWER unit would not operate because there was not enough demand for electricity in New England and there were other more economical sources of generation, and not because the MASSPOWER unit needed maintenance.
The historical availability of the MASSPOWER unit to generate energy selected for dispatch has been as follows: 1994, 94.91%; 1995, 98.10%; 1996, 94.54%; 1997, 94.50%; 1998, 94.23%; 1999, 91.75%; 2000, 90.29%; 2001, 92.65%; 2002, 97.87%; 2003, 97.45%; 2004, 93.82%; 2005, 98.00%; and Jan.-April 2006, 99.84%.
The historical capacity factors of the MASSPOWER unit have been as follows: 1993, 87.81%; 1994, 75.36%; 1995, 79.03%; 1996, 79.13%; 1997, 92.34%; 1998, 86.26%; 1999, 84.02%; 2000, 80.01%; 2001, 63.71%; 2002, 76.96%; 2003, 77.65%; 2004, 58.97%; 2005, 40.30%; and Jan.-April 2006, 4.40%.
Section 6.3 and Appendix D of the PPA increase the capacity payment of MASSPOWER if the monthly actual dispatch (“MADH”) exceeds 85% of the time.
In 1997, the-General Court, like other legislatures in New England, restructured the electric industry in Massachusetts. This resulted in the adoption of a phase-in of retail access, meaning that end-use customers, once they were eligible, were allowed to buy their energy from suppliers other than their local utility. Also, the existing distribution utilities were given incentives to divest themselves of generation. As a result of these changes, the current contractual market for most market participants has reflected a move to short-term contracts. This, however, is not true for the municipal systems. The municipal systems, including the purchasers through MMWEC of shares of the MASSPOWER Facility, continue to have long-term service obligations to their customers and, therefore, need long-term resources to meet those service obligations.
Consequently, while investor-owned utilities were given strong incentives to buy out their power purchase agreements, MMWEC was exempt from the restructuring legislation.
WMECo negotiated a buyout for approximately $80 million of its long-term contract with MASSPOWER. The buyout agreement was signed on October 4, 1999. This buyout was approved by the Massachusetts Department of Telecommunications and Energy (“DTE”); and the buyout was consummated on May 17, 2001.
On June 8, 2004, MASSPOWER signed an agreement with BECo and Com/Elec (by then both NSTAR) for a buyout for approximately $377 million of their remaining long-term electric contracts. This buyout was also approved by the DTE; it was consummated on March 1, 2005.
After consummation of the NSTAR buyout in March of 2005, approximately 92% of MASSPOWER’s output became subject to short-term market sales, referred to as “merchant” operations. Thus, MASSPOWER then derived 92% of its dispatch bid for the Facility based *273 upon its own opportunity costs (such as the resale of gas), and only 7.86% on MMWEC’s opportunity costs under the PPA.
For a number of reasons, most particularly a significant increase in the cost of natural gas, in the spring of 2005, MASSPOWER began negotiating agreements to restructure (that is, to terminate or assign) its long-term gas supply and transportation agreements. That process was completed in the summer and fall of 2005. As a result, the MASSPOWER unit currently operates on gas purchased in the “spot” market.
Because of these several changes, the dispatchability of the MASSPOWER unit has reduced from an average of approximately 80% between 1993 and 2003 to less than 5% between January and April of 2006. MMWEC, however, continues to pay MASSPOWER fixed charges of about $8 million per year, while it receives very little electricity therefrom. The economics of the PPA have become distinctly unfavorable to MMWEC.
The interpretation of the PPA and the performance thereof “shall be in accordance with the laws of the Commonwealth of Massachusetts.”
The final section of the PPA is an integration clause which reads, ‘This Agreement constitutes the entire Agreement between the Parties relating to the subject matter hereof, and all previous agreements, discussion, communications and correspondences with respect to the subject matter hereof are superseded by the execution of this Agreement.”
RULINGS OF LAW
All five counts in the Second Amended Complaint are grounded, in one way or another, on the PPA, a contract between sophisticated and well-represented parties, which requires interpretation by the Court.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “ [Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). This Court cannot — nor should it — attempt to rewrite the PPA and, by so doing, impose upon the parties an agreement that they never made. “It is not the role of the court to alter the parties’ agreement.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Nor is this a situation in which the Court should attempt to outsmart the parties.
MMWEC charges MASSPOWER:
1.with “failure to operate the Facility as a dispatch-able unit delivering energy on a nearly continuous basis, and to deliver energy to which MMWEC is entitled [and] has caused and will continue to cause MMWEC harm for which there is no complete and adequate remedy,” and, therefore, seeks a significant degree of specific performance [Sec. Am. Comp. para. 73);
2. with breaching the PPA “by knowingly, willfully, intentionally and unlawfully (a) modifying the terms and conditions of, or terminating the Fuel Agreements without MMWEC’s approval; and (b) failing to operate the Facility as a dispatchable unit and failing to deliver energy to MMWEC regularly and without interruption” [Sec. Am. Comp. para. 80);
3. with violating “the covenant of good faith and fair dealing inherent in the [PPA] by undertaking renegotiation and amendment or termination of the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s consent and by disregarding its obligations to operate the Facility as a dispatchable unit, all for an ulterior, improper and unfair purpose” [Sec. Am. Comp. para. 83];
4. with engaging “in unfair or deceptive acts or practices in the conduct of trade or commerce in Massachusetts in violation of G.L.c. 93A, secs. 2 and 11 ... by knowingly and intentionally undertaking renegotiation and amendment or termination of the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s consent and by disregarding its obligations to operate the Facility as a dispatchable unit, all for an ulterior, improper and unfair purpose” [Sec. Am. Comp. para. 86]; and
5. for the foregoing, demands “a judgment declaring the following: (a) MASSPOWER is required to operate the Facility as a dispatchable unit, and to deliver energy to MMWEC regularly and without interruption; (b) MASSPOWER may not modify the terms and conditions of, or terminate, the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s approval; (c) MASSPOWER’s failure to operate the Facility as a dispatchable unit is a material breach of the Agreement” [Sec. Am. Comp, para. 91].
In assaying the charges, the Court observes the considerable, and essentially undisputed, evidence of what was happening outside the four corners of the PPA during the time from its execution in April of 1990 to the time of the trial in 2006. Since April of 1990, generating resources and power contracts such as the PPA have been subject to three major NEPOOL market designs. These three market designs are described in the Affidavit of William H. Dunn, Jr., MMWEC’s expert witness on the industry, as: (i) the “Own Load Dispatch” (“O/L Dispatch”) market design, which was used from before the PPA was signed through April 1999, and was the design under which the PPA was negotiated; (ii) the “Single Market Price” design, which was used from May 1999 through February 2003; and (iii) the Locational Marginal Pricing (“LMP”) design, which started operation on March 3, 2003. Each of these changes had an effect on not only the parties to *274 the PPA, but to the entire New England electrical energy market.
During the same period, in Massachusetts and elsewhere in New England, significant changes were brought to the market by new deregulation statutes. The existing distribution utilities were given incentives to divest themselves of generation. According to Mr. Dunn, “as a result of these changes, the current contractual market for most market Participants has reflected a move to short-term contracts.” The municipal systems, however, were not included in the new legislation and, therefore, continued to cling to long-term resources for their customers.
Additionally, throughout this period the relative prices of different fuels used to generate electricity at power plants changed dramatically, the comparative economics of power plants were affected, and many newer, more efficient plants were constructed and came on line.
Significantly, the PPA, designed as it was to cover a 20-year period, failed to address, contemplate or provide methods or means to deal with these issues. Additionally, in some instances, even though there were some relief opportunities in the contract language, they were not availed of by MMWEC.
The Court looks primarily to the PPA to see what light it throws on the several charges in the Second Amended Complaint.
The failure by MASSPOWER to operate the Facility as a dispatchable unit.
First is the charge that MASSPOWER “fail[ed] to operate the Facility as a dispatchable unit delivering energy on a nearly continuous basis, and to deliver energy to which MMWEC is entitled.” To test the merits of this charge, the Court turns to Section 4.3 of the PPA. It is there that MASSPOWER’s obligations to MMWEC regarding the dispatchability of the Facility are set forth.
By Section 4.3 MASSPOWER and MMWEC “agree[d] that the Facility will be available for dispatch by NEPEX in accordance with the NEPOOL Agreement and that the Facility will be deemed a dispatchable unit for purposes of economic dispatch by NEPEX, subject to provisions set forth in Appendix C.” (Emphasis added.) That language is not complicated when read with an understanding of how NEPOOL, NEPEX and ISO-NE operated.
MASSPOWER is obligated to have the facility “available for dispatch by NEPEX.” This means that the Facility must be in a physical condition, ready at all reasonable times, to be turned on and deliver electrical power when directed to do so by NEPEX. Not only must the physical plant be connected to the system, it also must have available and ready for use the necessary fuel — here natural gas — to run the plant. No evidence was presented to demonstrate that MASSPOWER’s plant was not, at essentially all times, physically ready, connected to the system and had available sufficient natural gas fuel to run the plant. The operating records shown above, agreed to by the parties, reflect this fact.
Further, there was no evidence that MASSPOWER failed to employ “prudent utility practice” in the operation of its facility. As found above, the PPA defined “prudent utility practice” as “any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry in New England which, in the exercise of reasonable judgment in light of the facts known at the time a decision was made, could have been expected to accomplish the desired result in a manner consistent with regulations, reliability, safety, environmental protection, economy and expedition.” No failure in this regard was shown.
So long as the plant was available for dispatch, it then became the role of NEPEX or ISO-NE, not MASSPOWER, to apply the rules and provisions for “economic dispatch.” This meant that NEPEX or ISO-NE, as the central system operators, had the obligation of balancing electric generation with fluctuating electric demand, or load, and dispatching plants accordingly. To say that the MASSPOWER plant was available for “economic dispatch” meant only that it was ready for the central system operator to select it among the many other available units for generation based on turning on such available units in the order of their incremental cost of production as calculated in accordance with NEPOOL rules. The determination of the order of dispatch based on the order of the incremental cost of production was the role of NEPEX or ISO-NE, not MASSPOWER.
Again, there was no evidence presented to demonstrate, or even suggest, that anything other than the economic dispatch process was followed by NEPEX or ISO-NE with regard to MASSPOWER’s Facility.
Further, with perhaps two exceptions, this Court finds nothing else in the PPA that provides for or directs MASSPOWER with regard to the operation of the Facility as a dispatchable unit.
The first of those two exceptions is the provision in Section 4.4 of the PPA that requires MASSPOWER to “use due diligence to make available to [MMWEC], regularly and without interruption, [MMWEC’s] Entitlement.” The entitlement of MMWEC is the percentage of the Net Capability and Corresponding Energy of the Facility that MASSPOWER has agreed to sell and MMWEC has agreed to buy. MMWEC’s entitlement is 7.86% of MASSPOWER’s Net Capability and Corresponding Energy of the Facility. There was no showing of any failure to provide MMWEC with its entitlement.
What seems to be the real underlying complaint about the MASSPOWER Facility is that over the years, particularly in recent years, it has become economically more expensive to operate and, consequently, has been less frequently selected for economic dis *275 patch by the central system operator. This issue brings up for scrutiny MASSPOWER’s dealings with the natural gas fuel supply agreements and the buyouts by WMECo and NSTAR.
MMWEC argues that the gas supply contracts were in some way implied into or merged with the PPA. Consequently, MMWEC contends that, read together, one can envision a requirement that the MASSPOWER plant must be maintained as a “baseload” operation. MMWEC’s expert, Mr. Dunn, described a baseload operation or capacity “as capacity that runs around the clock (even if not at full output in the overnight/weekend hours) whenever it is not out of service on an outage.” This is a kind of “must run” operation.
The PPA, again in Section 4.3, speaks briefly about must run operations when it says: “In the event that the Facility is dispatched at a capacity factor of less than sixty percent over a two year period, [MASSPOWER] agrees to cooperate with [MMWEC] and the other Purchasers if they decide to seek to have the Facility declared ‘must-run’ by NEPOOL.” This, however, is the only reference to must run operations in the PPA, and neither situation came about. There was no evidence that the facility was dispatched at a capacity factor of less than 60% over a two-year period, and there was no request by MMWEC or any other purchasers from MASSPOWER to cooperate to seek to have the facility declared must run by NEPOOL.
Additionally, Section 6.3 and Appendix D provide that MASSPOWER is entitled to an increased capacity payment if the Facility is dispatched more than 85% of the time. This provision and the provision above for requesting must run status from NEPOOL on operations for two years at under 60% would make little sense if the plant was, at all times, to be on baseload operation.
While MMWEC may well have desired and intended to sign on with MASSPOWER for a baseload operation, the PPA contains no language compelling that result. Consequently, MMWEC must rely upon extrapolation from the fuel supply agreements with DistriGas and ProGas. This Court, however, does not read either the PPA or the fuel supply agreements — the latter to which MMWEC is not even a party — as importing those agreements into the PPA.
For all of the foregoing reasons, this Court’s interpretation of the PPA contract language leads it to rule that MASSPOWER did not fail to operate the facility as a dispatchable unit.
The knowing, willful, intentional and unlawful modifying of the terms and conditions of, or terminating, the Fuel Agreements without MMWEC’s approval.
The second charge is that MASSPOWER knowingly, willfully, intentionally and unlawfully modified the terms and conditions of, or terminated, the fuel agreements without MMWEC’s approval. This charge involves an examination of the PPA contractual language relating to MMWEC’s rights with regard to the fuel agreements. Sections 2.4, 2.5 and 9.4 are keys to this analysis.
Section 2.4 acknowledges that MASSPOWER intended to enter into an initial fuel supply and fuel transportation arrangement and a long-term fuel supply and fuel transportation arrangement for fuel to the Facility on terms and conditions which were acceptable to MMWEC. Additionally, MASSPOWER agreed to submit the fuel supply and fuel transportation contracts comprising its initial and long-term fuel supply and transportation arrangements to MMWEC for approval.
This process was followed with regard to the initial fuel supply and transportation contracts. In fact, on August 12, 1991, MMWEC confirmed in writing to MASSPOWER that “[e]ach of the Fuel Contracts is acceptable to MMWEC and MMWEC waives any right it may have to terminate the Power Sale Agreement pursuant to Section 2.4 thereof.” There thus is no breach with regard to the initial fuel supply agreements.
MMWEC, however, claims authority to be notified of any modification of the terms and conditions of, or termination, of the fuel agreements, and argues that it has approval rights in connection therewith. This brings the Court to Sections 2.5 and 9.4.
Section 2.5 permits either MMWEC or MASSPOWER to terminate the PPA “prior to the Commencement of Construction without further obligation to the other by tendering a written notice to the other.” There is a proviso, however, that conditions this termination on the objection by MMWEC to any fuel agreement pursuant to Section 2.4, and MASSPOWER’s inability to cure or correct the matters to which MMWEC objects and MMWEC does not waive its objection in a timely manner as specified in Section 2.4. This never happened. First, MMWEC never objected, and second, it waived any objection under Section 2.4.
The remedies under Section 2.5 are expressly limited to the period “prior to Commencement of Construction” and are not said, nor can they be read, to extend to any later period.
Additionally, when MMWEC signed the PPA it was fully aware that the fuel supply agreements would change and be modified over their 20-year lifetimes. In fact they were modified on many occasions, with MMWEC’s knowledge and without its objection, pursuant to the reopener provisions.
Section 9.4 of the PPA is the “most favored nation” clause permitting MMWEC to substitute in place of its own, prior to construction, any other subsequent power purchase agreement made by MASSPOWER. MMWEC had the opportunity to make such substitution when the WMECo agreement was presented to it but MMWEC knowingly chose not to do so. Had MMWEC made the substitution for the WMECo contract, it would have had express rights to prevent MASSPOWER without the prior written consent of MMWEC, from amending the reopener provision of its gas purchase contracts or *276 changing the price terms thereof other than in accordance with said reopener provisions, unless such change was reasonably likely not to have a material adverse effect on MMWEC or its customers. Further, MMWEC would have had the right to prevent MASSPOWER without the prior written consent of MMWEC, from entering into any contract or contracts which replace either or both of the long-term gas purchase contracts or any gas transportation contracts identified in Section 2.1 of Appendix A, unless the pricing and any price reopener terms of such replacement contracts are substantially the same as those of the contract being replaced or are reasonably likely not to have a material adverse effect on MMWEC or its customers, taking into account the alternative sources of long-term gas supplies and transportation arrangements available to the Facility at that time.
The foregoing provisions in the WMECo agreement are precisely what MMWEC wants to enforce at this time. But no such provisions appear in the PPA. Given that MMWEC had the opportunity to have the express rights of the WMECo agreement and chose not to do so, it cannot now ask this Court to read the essence of those provisions into the PPA.
MMWEC makes an additional argument that it is an intended third-party beneficiary of the gas supply agreements. This Court rules otherwise. The PPA’s integration clause makes clear that it “constitutes the entire Agreement between the Parties relating to the subject matter [tjhereof.”
Further, in making the gas contracts, MASSPOWER bargained solely for itself.
The usual assumption, it is said, is that contracting parties “bargain and agree for themselves and only incidentally for third persons... According to Restatement (Second) of Contracts §302 (1979) — a formulation followed by our courts — the assumption is overcome and a third person attains standing to sue on a promise as an ’’intended beneficiary" when this is “appropriate to effectuate the intention of the parties” and “the circumstances indicate that the promisee intends to give the beneficiary [third person] the benefit of the promised performance (quoting from §302[l]b]).
Macksey v. Egan, 36 Mass.App.Ct. 463, 468 (1994).
MMWEC here can make no successful contention that it is any more than an incidental beneficiary of those contracts. It would not be appropriate to effectuate the intention of the parties to the gas contracts to have MMWEC as a beneficiary thereof. Nor, given the integration clause in the PPA, would it be appropriate to effectuate the intention of that agreement to have MMWEC be a third-party beneficiary of the gas contracts.
This Court rules that there was no knowing, willful, intentional and unlawful modifying of the terms and conditions of, or terminating, the Fuel Agreements without MMWEC’s approval because MMWEC had no contractual rights enabling it to give or withhold such approval.
The violation of the covenant of good faith and fair dealing inherent in the PPA and engaging in unfair or deceptive acts or practices in the conduct of trade or commerce in Massachusetts in violation of G.L.c. 93A, secs. 2 and 11.
Counts III and IV of the Second Amended Complaint each are grounded upon the contentions that MASSPOWER knowingly and intentionally undertook renegotiation and amendment or termination of the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s consent and by disregarding its obligation to operate the Facility as a dispatchable unit, for an ulterior, improper and unfair purpose. It is contended that these actions by MASSPOWER violated both the implied covenant of good faith and fair dealing in the PPA and G.L.c. 93A, Sec. 11.
The Court having found and ruled that no such actions occurred, there cannot be any violation of the covenant or the statute.
Declaratory judgment.
MMWEC demands “a judgment declaring the following: (a) MASSPOWER is required to operate the Facility as a dispatchable unit, and to deliver energy to MMWEC regularly and without interruption; (b) MASSPOWER may not modify the terms and conditions of, or terminate, the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s approval; [and] (c) MASSPOWER’s failure to operate the Facility as a dis-patchable unit is a material breach of the Agreement.”
The Court having found and ruled that MASSPOWER has not breached the PPA or violated any other obligations to MMWEC, different declarations from those demanded must be made.
ORDER FOR JUDGMENT
On the findings of fact and rulings of law set forth above, this Court directs and orders that a final judgment enter dismissing, with prejudice, the Second Amended Complaint, with each party to bear its own costs.
Such final judgment must include declarations to the effect that: (a) MASSPOWER has not failed to operate the Facility as a dispatchable unit, and has not failed to deliver energy to MMWEC regularly and without interruption; (b) MASSPOWER may modify the terms and conditions of, or terminate, the Fuel Agreements without MMWEC’s knowledge and without MMWEC’s approval; and (c) MASSPOWER did not fail to operate the Facility as a dispatchable unit and, therefore, did not materially breach the Agreement.